## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| BARRY MORGULOFF | |
| *Plaintiff* | |
| v. | CIVIL ACTION NO. _____ |
| BAYLOR HEALTH CARE SYSTEM d/b/a BAYLOR REGIONAL MEDICAL CENTER AT PLANO, BAYLOR REGIONAL MEDICAL CENTER AT PLANO, CHRISTOPHER DUNTSCH, M.D., and KIMBERLY MORGAN, APN | **DEMAND FOR JURY TRIAL** |
| *Defendants* | |

### PLAINTIFF'S ORIGINAL COMPLAINT

Barry Morguloff files this lawsuit against Baylor Health Care System d/b/a Baylor Regional Medical Center at Plano, Baylor Regional Medical Center at Plano, Christopher Duntsch, M.D., and Kimberly Morgan, APN, for what can only be described as one of the most prolific mass torts involving medical malpractice in Texas history. As a result of the tortious conduct of these Defendants, Barry Morguloff has suffered permanent, life altering personal injuries which will plague him for the rest of his life.

### JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter and venue is proper because (1) one or more acts or omissions forming the basis for liability occurred in Dallas County, Texas, (2) Baylor Health Care system d/b/a Baylor Regional Medical Center at Plano and Baylor Regional Medical Center at Plano are corporate entities located in Dallas County, Texas and (3) this lawsuit may affect the outcome of a pending bankruptcy proceeding. *See* 28 U.S.C. § 1334(b).

2.     The bankruptcy proceeding mentioned above is Case No. 1:13-bk-20510, *In Re Christopher Daniel Duntsch*, filed in the United States Bankruptcy Court, District of Colorado.

## PARTIES

3.     Barry Morguloff ("Barry") is an individual resident of Texas.  He resides in Dallas, Texas.

4.     Baylor Health Care System d/b/a Baylor Regional Medical Center at Plano is a corporation with its registered office at 2001 Bryan Street, Suite 2300, Dallas, Texas 75201. It may be served with process by serving its registered agent, CT Corporation System, at 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

5.     Baylor Regional Medical Center at Plano is a corporation with its principal and registered offices at 2001 Bryan Street, Suite 2300, Dallas, Texas 75201. It may be served with process by serving its registered agent, CT Corporation System, at 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

6.     Collectively, Baylor Health Care System d/b/a Baylor Regional Medical Center at Plano and Baylor Regional Medical Center at Plano collectively are referred to as "Baylor Medical".

7.     Christopher Duntsch, M.D. ("Duntsch") is an individual formerly licensed to practice medicine in Texas.  As detailed below, his license to practice medicine was suspended by the Texas Medical Board in June of 2013.  He may be served with process through his registered agent, Linda L. Maloney, at 2777 N. Stemmons Freeway, Suite 1157, Dallas, Texas 75207.

8.     Kimberly Morgan, APN ("Morgan") is an individual resident of Texas.  She can be served with process at 5111 Cimarron Circle, Allen, Texas 75002, or wherever she may be found.  At all times material to this lawsuit, she was Duntsch's surgical assistant and Advanced Practice Nurse.

## PRE-SUIT STATUTORY COMPLIANCE

9.     Barry has served pre-suit notices and authorizations more than sixty days before filing this lawsuit, as required by Tᴇx. Cɪv. Pʀᴀᴄ. & Rᴇᴍ. Cᴏᴅᴇ § 74.051.

10.     As a result of serving the pre-suit notices and authorizations, the statute of limitations has been tolled as to all defendants for a period of 75 days.

11.     All conditions precedent to bringing this action have occurred or been performed.

## FACTUAL BACKGROUND

### Who is Christopher Duntsch?

12.     Duntsch is originally from Colorado.  He purportedly completed a six-year residency and fellowship in Tennessee in 2010; however, during his residency, he was suspected of cocaine use during his fourth year and sent to an impaired physician program.

13.     Specifically, a nurse at the hospital where Duntsch worked witnessed him using cocaine both the night before and in the early morning before going to the hospital to perform surgery.  This nurse questioned Duntsch about the cocaine use and operating under the influence; he told her not to worry, as he regularly used cocaine before operating on patients.  The nurse called the neurosurgery residency program, who immediately had the human resources department call Duntsch under the pretense they were performing random drug screens.

14.     In response, Duntsch claimed he had to go to ICU to care for a patient—but he would be right back.  He did not show up at the hospital for three days.

15.     When he finally returned, he was sent to an impaired physician program in Tennessee for several months—perhaps as long as a year.  Regardless, he ended up completing his residency program and fellowship and was unleashed on the unsuspecting public.

**Baylor Medical Hires Christopher Duntsch.**

16.     In the summer of 2011, Baylor Medical entered into a contract and / or joint venture with Minimally Invasive Spine Institute, PA ("MISI") and Christopher Duntsch to perform spine surgeries at Baylor Medical's facilities in Plano, Texas.

17.     As a part of the venture, Baylor Medical agreed to pay a large sum of money up front--$600,000.00, to be exact, in order to finance Duntsch to come to Texas so he could perform surgeries for Baylor Medical.

18.     Baylor Medical memorialized the agreement on July 1, 2011 by executing a "Physician Practice Start-Up Assistance Agreement".[1]  One of the stated purposes of the agreement was Baylor Medical's desire to "…induce the Physician to relocate to the Hospital Service Area and to join the Hospital's Medical Staff…"

19.     This "inducement" included Baylor Medical paying Duntsch up to $15,000.00 for relocation expenses, paying for "operating expenses" not to exceed $44,000.00 per month for a period of one year, pay Duntsch a salary of $50,000.00 per month as "guaranteed income" for one year, all on top of the $600,000.00 "advance" mentioned above.

20.     In addition, the contract provided, "[a]s compensation for Physician's services and in consideration of Physician's other agreements and covenants as set forth herein", MISI executed a "Physician's Service Agreement" with Duntsch, which among other things, coincidentally obligated MISI to pay Duntsch a base salary of $600,000.00 beginning May 24,

---

[1] *See* **Ex. A** (July 1, 2011 "Physician Practice Start-Up Assistance Agreement").

2011.[2] It also entitled Duntsch to attractive bonuses, which amounted to 40% of all gross collections by MISI for Duntsch's billings in excess of $800,000.00.

21. Duntsch and MISI also jointly signed a promissory note to pay Baylor Medical the sum of $600,000.00 with interest subject to a "forgiveness" provision.[3] Repayment, assuming it was required, was scheduled to begin on the first anniversary of the note, which would have been July 1, 2012. However, Baylor Medical contemplated that Duntsch's success as a surgeon would forgive him from repayment at all. "Forgiveness" of the debt was contracted at the rate of one-third of the loan balance after the first year, one-half of the loan balance after the end of the second year, and the remainder of the loan balance after the end of the 36th month after the end of the guarantee period (twelve months from the commencement date of July 1, 2011).

22. In addition to the financial compensation Baylor Medical paid Duntsch to perform surgeries at their facility, Baylor Medical also provided marketing dollars and employed one or more marketing agents to create patients for Duntsch, even encouraging other Baylor Medical physicians to refer patients to Duntsch. As it would later unfold, this continued even after questions about Duntsch's competence and capacity were called into question by other physicians and reported to Baylor Medical.

23. And so it began. Baylor Medical's recruitment of Duntsch was a success. He would ultimately move to Texas as a direct result of Baylor Medical's compensation package. Notwithstanding problems during Duntsch's residency and the fact he had not been in an operating room for about a year and a half (he had been in a lab doing research), Baylor Medical

---

[2] *See* **Ex. B** (May 24, 2011 "Physician Services Agreement").

[3] *See* **Ex. C** (July 1, 2011 Promissory Note).

would welcome Duntsch to perform spine surgery on unsuspecting patients who had entrusted Duntsch and Baylor Medical with their care.

24.     Duntsch ultimately moved to Dallas with his longtime friend and roommate, Jerry Summers.  Jerry ran errands, served as a chauffeur, maintained Duntsch's residence, and, on occasion, joined Duntsch in one of his apparent pastimes—illicit drug use.  Duntsch would later render him a quadriplegic after a night of cocaine use.

25.     Initially, Duntsch and Jerry stayed at the W Hotel, where Duntsch was known to be a regular at the popular Ghost Bar. They then moved their residence to Hotel ZaZa, where Duntsch bragged about their parties and tearing up their hotel room.

### MISI Cuts the Cord.

26.     Soon after Duntsch arrived in Dallas, Dr. Michael Rimlawi, at the time co-owner of MISI, suspected that something was wrong with Duntsch, whether it be impairment from drugs, alcohol, mental illness, or a combination of all three.

27.     Duntsch lasted about three months at MISI. During his short tenure, he spent little time in the operating room.  MISI representatives observed him to be boastful about his capabilities and critical of the work of other surgeons.  His behavior was aloof and sometimes bizarre.

28.     Towards the end of his short tenure with MISI, Duntsch performed his first surgery for Baylor Medical in Plano.  He performed the surgery on a Thursday, but then left for Las Vegas without making any plans for anyone to care for his patient, only to show up the following Monday.   After the patient was in the hospital for one or two postoperative days with no follow-up by Duntsch, Baylor Medical called Dr. Rimlawi and told him the patient wanted to be discharged and didn't know why they were still there.

29.     When Dr. Rimlawi arrived, Baylor Medical representatives told him they had attempted to get in touch with Duntsch to no avail.  When Duntsch arrived back in town on Monday, Dr. Rimlawi confronted him, asking him who was supposed to see Duntsch's patients over the weekend.  Duntsch would later indicate that he didn't know and he wasn't on call.  Duntsch's malevolent and willful ignorance of his patients' well-being would continue during and after his stint with Baylor Medical and MISI.

30.     This was the final straw on an already strained relationship with MISI.  MISI terminated its relationship with Duntsch a few short days later. MISI claims that Duntsch abandoned his treatment of patients around September 2011, absconded with MISI's property and medical equipment,  and, despite its demands, he has refused to return any of it.

31.     In addition to the other problems with Duntsch, Dr. Rimlawi and others observed that Duntsch was extraordinarily self-centered.  He was considered to be egocentric, and made statements to Baylor Medical claiming he was the best spine surgeon in Dallas and that none of the other spine surgeons in Dallas were competent.  Dr. Rimlawi would later warn Baylor Medical about continuing any relationship with Duntsch.  Dr. Rimlawi's warnings were summarily ignored.  Baylor Medical's obvious concern was how they were going to get repaid the monies they had advanced to Duntsch.  They needed him operating early and often.

### Duntsch's Reign of Terror at Baylor Medical.

32.     Baylor Medical welcomed Duntsch with open arms, due to the money it had paid and, in part, due to the enormous profits it hoped to reap in the future, despite Dr. Rimlawi's warnings and, ultimately, warnings from other physicians.  Among other things, Baylor Medical entered into a lease agreement with Duntsch to keep his practice located within the Baylor Plano service area.   MISI, Duntsch, and Baylor Plano reached a tacit

agreement:   If Duntsch kept his practice in the Baylor Plano service area and continued bringing patients to Baylor Medical and operating on them there, Baylor Medical would not enforce the repayment of loans or pursue any legal claims against MISI or Duntsch for violating the agreements previously executed.

33.    During the time Duntsch worked for Baylor Medical, he used and abused alcohol as well as illicit and prescription drugs.  It is believed that his pattern was to use cocaine for two to four days at a time, all the while operating on unsuspecting victims. Following two to four days of cocaine use, he would "crash" for a day or two.   Efforts to contact him during periods of time when he would "crash" were useless. Nevertheless, Baylor Medical never obtained a drug test for Duntsch, did not investigate his unusual behavior, and did not heed the warnings it had received about him.

34.    Duntsch was also a known alcoholic and is believed to have been an abuser of prescription drugs. He would frequently drink vodka in the morning, mixing it with juice.  He illegally obtained prescription drugs such as Lortab, Xanax, and Oxycontin, for his own use.   He was known to use alcohol while working as a spine surgeon. Alcohol, drugs, and drug paraphernalia were found in his office at Baylor Medical's facilities in Plano after he eventually fled to Colorado following the suspension of his medical license.

35.    Baylor Medical eventually requested Duntsch undergo drug testing, promising a prestigious title in return, but he refused, dodging at least five scheduled drug tests.  Regardless, Baylor Medical let him continue to work for them and maim and kill unsuspecting patients.

36.    Duntsch's erratic and disorganized behavior continued.   In addition, Baylor Medical employees and other staff participating in surgeries with him witnessed a startling lack of surgical skill and understanding of regional anatomy, which resulted in unnecessarily high

blood loss, unnecessarily long procedures, misplacement of surgical hardware in patients, misuse of hardware, and other complications. Physicians observing him described Duntsch as "dangerous" and "the worst surgeon they had ever seen." Meanwhile, Baylor Medical continued to actively promote Duntsch and encourage other physicians associated with Baylor Medical to refer their patients to him. Duntsch was under pressure to schedule surgeries so Baylor Medical could recover the money it paid him. During this period, it was not unusual for Duntsch to be in the hospital administrator's office daily, and his unusual and erratic behavior began to wear on the hospital administration.

37.     On November 7, 2011, Duntsch was scheduled to perform surgery on a gentleman named Kenneth Fennell at Baylor Medical's facilities in Plano. The surgery had to be cancelled because Duntsch failed to order the appropriate surgical hardware and instruments.

38.     On November 14, 2011, Duntsch managed to get Mr. Fennell to the operating room and to have the instruments that he intended on using. However, the surgery was an ill-conceived approach to Mr. Fennell's problems and, in essence, was an unnecessary surgery performed on a 68 year-old man that yielded no benefit to him whatsoever and set him up to require further surgery.

39.     Duntsch's motivation for performing unnecessary and ill-conceived surgeries was, in part, due to pressure and expectation from Baylor Medical that he bring in revenue to pay them back for the monies they had advanced him and ideally, to turn enormous profits for them.

40.     On December 6, 2011, Duntsch performed surgery on Mary Efurd at the Baylor Medical's facilities in Plano. This was also an unnecessary and inappropriate surgery which did not address her problems and set her up to require another surgery.

41.     On December 30, 2011, Duntsch operated on Robert Passmore at Baylor Medical's facilities in Plano.   During the surgery, a surgeon present in the operating room noticed Duntsch was doing things that were unusual and alarming.   At one point, the other surgeon grabbed Duntsch's hands/surgical instruments and pleaded with him to stop; telling Duntsch that he was dangerous and he would never operate with Duntsch again.   This altercation was witnessed by the entire operating room staff, including Morgan, who assisted Duntsch during the debacle.   Morgan failed to notify anyone in Baylor Medical's chain of command of the altercation, as required by nursing standards of care.     Mr. Passmore was unfortunately maimed by Duntsch and has suffered severe, permanent personal injuries as a result.

42.     Mr. Passmore was the last victim Duntsch operated on before he maimed his next unsuspecting victim, Barry Morguloff.

### *Barry Morguloff's Misfortune.*

43.     Barry was a 45 year old man with common back problems.   Prior to this disaster, he was an active man who enjoyed skiing, biking, and running—he had even trained for a triathlon.   He enjoyed spending time playing with his small child.   In 2011, he suffered an onset of localized back pain.   Barry's primary care physician referred him to Dr. Haynsworth.   He administered a series of steroid injections to ease the pain; unfortunately, they provided no relief.

44.     Dr. Haynsworth, a Baylor Medical physician who was encouraged to refer patients to Duntsch, then referred Barry to Duntsch.   Barry and his wife met Duntsch for an initial consultation at Baylor Medical's Plano facilities in December 2011.   After performing a physical examination and reviewing some of radiographic images, Duntsch confidently told Barry:

**"I can fix you."**

45.     Duntsch recommended an anterior approach (through Barry's navel area) to fuse Barry's L5-S1 vertebrae.  He scheduled Barry's surgery for January 11, 2012.  It would ultimately be a disaster.

46.     Barry's surgery began as scheduled and should have taken less than ninety minutes.  The medical records show the OR was scheduled for a two hour procedure.  The surgery would ultimately last approximately four and a half hours.  Dr. Randall Kirby, a vascular and general surgeon, participated in the procedure; he would later recount the horror he witnessed in a June 23, 2013 letter to the Texas Medical Board, wherein he pleaded for intervention, because Duntsch "is an impaired physician, a sociopath, and must be stopped from practicing medicine by the Texas Medical Board immediately".[4]  He also related ridiculous statements made by Duntsch in his presence wherein he indicated that he was the best spine surgeon in Dallas and the only spine surgeon in Dallas who was trained in minimally invasive spine surgery.

47.     According to Dr. Kirby, Duntsch's performance "was pathetic on what should have been a fairly easy case—he [Duntsch] had trouble from the start with getting the disc out, bleeding issues, poor visualization of the operative field, and seemed to be struggling getting the interbody device in position—he was functioning at a first to second year neurosurgical resident level but had no apparent insight into how bad his technique was".[5]

48.     Morgan *again* assisted Duntsch on Barry's procedure.  She never reported Duntsch's incompetence and impairment to Barry or the previous confrontation weeks earlier during Mr. Passmore's procedure where another doctor attempted to physically intervene in an

---

[4] **Ex. D** (Dr. Kirby's June 23, 2013 letter to the Texas Medical Board).

[5] *Id.*

attempt to keep Dr. Duntsch's from harming the patient.  Morgan had never reported anything to Baylor Medical in connection with Mr. Passmore's failed surgery and never once reported it to Barry.  Had Barry been informed of what had gone on, he would not have proceeded with the surgery by Duntsch and Morgan.

49.     Office records from Duntsch before Barry's surgery clearly show that Barry had back pain that did not involve his legs.  Immediately following Duntsch's surgery, Barry began to experience continuous pain, paresthesia, and loss of sensation in his left leg.  Although Duntsch's records sporadically mention this, nursing records confirm that Barry was in excruciating pain to the point that the nursing staff called Morgan to the floor twice to evaluate what to do with Barry's left leg.  Following the second request, Morgan would eventually come to evaluate Barry.  Duntsch eventually showed up after hours had passed with Barry complaining of left leg pain of "10" on a scale of 1 to 10.  Records report over and over of his complaints of "significant pain, numbness, and weakness" in his left leg.  Duntsch and Morgan continued to medicate Barry with pain medications and ignored the significant clinical change in Barry's condition.  No diagnostic imaging studies were ordered and no reasonable explanation was offered for Barry's condition.  Ultimately, Barry left the hospital with what lead to permanent, severe personal injuries involving the S1 nerve, among other things.  When he called Duntsch's office, he was told it would "go away".

50.     It wasn't until more than six months elapsed before Duntsch even bothered to evaluate Barry's condition.  After over six months of complaining of continuous, severe pain, weakness, and loss of sensation in his left leg, Duntsch finally ordered an MRI in an attempt to evaluate the problem.  Upon reviewing the results Duntsch failed to correlate Barry's signs and symptomatology to the radiographic evidence and insisted Barry was fine.  Duntsch told Barry

he had a "new problem" which had nothing to do with his prior issues or the surgery.  Barry would learn that Duntsch had not been forthright about his condition and that Duntsch ignored circumstances that a reasonable neurosurgeon would have more carefully evaluated.  Barry's symptoms would continue to get worse.

51.     Barry sought a second opinion from Dr. J. Michael Desaloms, Chief Neurosurgeon at Texas Health Presbyterian Hospital Dallas.  Desaloms reviewed an MRI and CT myelogram and determined that these imaging studies showed probable compression of the S1 nerve root from a posteriorly directed bone fragment from Duntsch's surgery.  Barry would later learn that the severe back and left leg pain along with the loss of sensation, paresthesia and weakness he had experienced for over 8 months was the result of  multiple bone fragments in his spinal canal, compressing and adhering themselves to his S1 nerve.  It would later be discovered that Duntsch installed the hardware incorrectly.  Barry needed surgery—immediately.

52.     Dr. Desaloms was able to tediously remove the large posterior bone fragment left behind by Duntsch as well as reveal and remove other bone fragments in order to decompress the ventral S1 nerve root.  Notwithstanding Dr. Desaloms' efforts, it was too late.  Barry is now faced with permanent nerve damage, for which there is no currently available surgical intervention to fix.  In addition, imaging studies have revealed permanent and severe arachnoiditis as a result of Barry's injuries to his spine.  This condition appears to be the result of scarring and adhesion to the spinal nerves which causes a lifetime of severe, debilitating pain.  While Barry is thankful to be alive, Barry will be forced to walk with a cane or some other assistance for the remainder of his life.  He is now only 47 years old.  Perhaps even worse, he will continue to have constant, day-to-day pain which requires multiple medications just to dull the pain.

### *Baylor Medical Does…Nothing.*

53.     Duntsch continued to operate on patients at Baylor Medical for their benefit for months, despite the documented problems of Kenneth Fennell, Mary Efurd, Robert Passmore and Barry Morguloff's disastrous surgeries.  Just weeks after permanently maiming Barry Morguloff, on February 2, 2012, Duntsch operated on his lifelong friend and roommate, Jerry Summers.  Duntsch rendered Mr. Summers a quadriplegic.

54.     Following his surgery, Mr. Summers would tell the ICU nursing staff he witnessed Duntsch using drugs the night before his surgery.  Baylor Medical suspended Duntsch's privileges and removed Duntsch from Jerry's case, assigning another spine surgeon to care for him—an unusual occurrence typically reserved for situations when a physician is believed to be impaired or incapacitated in some way.  Baylor Medical never reported this incident to the National Practitioner Data Bank or the Texas Medical Board.

55.     Inexplicably, Baylor Medical reinstated Duntsch's surgical privileges about a month later.  Just *one day* after his privileges were reinstated, Duntsch operated on another unsuspecting victim, Kelly Martin.  Sadly, Ms. Martin died as a result of massive blood loss during the surgery.  Other surgeons claimed Kelly's death was due to "horribly poor and clueless surgical technique".

### *Baylor Medical Tries to Save Face.*

56.     After Ms. Martin's death, Baylor Medical *again* suspended Duntsch.  During this time, Duntsch resigned his position with Baylor Medical.  In his April 20, 2012 resignation letter, Duntsch claimed he was moving his practice to a different location, and, as a result, he had elected "to resign" his medical staff position with Baylor Medical.[6]

---

[6] **Ex. E** (April 20, 2012 resignation letter).

April 20, 2012

Baylor Regional Medical Center at Plano
4700 Alliance Blvd.
Plano, Texas 75093
Medical Staff Services
Patti Sproles
Delivery via email pattis@baylorhealth.edu

RE:    Resignation at Baylor Regional Medical Center at Plano

Dear Ms. Sproles:

    I am in the process of moving my practice to a different location, and as a result I have decided to resign my position as a member of the medical staff and my clinical privileges at Baylor Medical Center at Plano, effective immediately.

Signed,

*Chris Duntsch*

Christopher Duntsch, MD, PhD

57.    Contrary to their legal, ethical, and moral duty to report Duntsch to the National Practitioner Data Bank and Texas Medical Board, Baylor Medical again failed to do so.  Duntsch would go on to kill or maim more patients, in part, thanks to Baylor Medical.

58.     Despite everything that had occurred at their direction and with their knowledge, Baylor Medical instead provided Duntsch with the following letter of recommendation, most notably on the same date of his "resignation", April 20, 2012: [7]



**PRIVILEGE**
Tex. Rev. Civ. Stat. Ann. Art. 4495b and 5.06
Tex. Health & Safety Code Chp. 161.032
Medical Staff Committee Document

April 20, 2012

Christopher Duntsch, MD
4708 Alliance Blvd.
Pavilion I – Suite 830
Plano, Texas 75093

Dear Dr. Duntsch:

On behalf of the Medical Executive Committee of the Medical Staff of Baylor Regional Medical Center at Plano, I am authorized to notify you of the following:

All investigations with respect to any areas of concern regarding Christopher D. Duntsch, M.D. have been closed.

As of this date, there have been no summary or administrative restrictions or suspensions of Dr. Duntsch's Medical Staff membership or clinical privileges during the time he has practiced at Baylor Reg. Medical Center at Plano.

Yours Very Truly

Patricia Sproles, CPCS
Director, Medical Staff Services

59.     For a few months, Duntsch applied to other hospitals around the DFW Metroplex without much luck.  Eventually, he was approached by Dallas Medical Center (formerly known as R.H. Dedman Hospital).  Much like Baylor Medical, they were anxious to have a revenue-

---

[7] **Ex. F** (April 20, 2012 letter from Baylor Medical).

producing staff spine surgeon and granted him temporary privileges to perform surgeries at their facility while they completed their credentialing process. Baylor Medical's recommendation letter facilitated just that.

60.     Thanks, in large part to Baylor Medical, Duntsch's reign of terror would continue. At Dallas Medical Center, he operated on a woman named Floella Brown.  In July 2012, Ms. Brown died as a result of a careless vascular injury, resulting from what other surgeons have described as "horrendous surgical technique" where Duntsch essentially transected her vertebral artery resulting in a stroke and her eventual death.

61.     After he killed Ms. Brown, Duntsch operated on another unsuspecting patient at Dallas Medical Center and removed one or more of the patient's spinal nerve roots and installed hardware intended for use in bony structures of the spine into the muscles *adjacent* to the patient's spine.  This surgery was performed so poorly, one surgeon contacted Duntsch's training program in Tennessee to confirm whether the Duntsch in Dallas was actually an imposter.  He was surprised to learn that Duntsch was actually what he purported to be—a medical doctor.

62.     Duntsch later performed another surgery so poorly the scrub nurses stopped him from operating further; ultimately, the entire operating room staff had to restrain Duntsch so he would stop what he was doing.

63.     Finally, the Texas Medical Board temporarily suspended Duntsch's license to practice medicine in Texas on June 26, 2013.

## VICARIOUS LIABILITY

### A.  Agency / Joint Venture

64.    Barry adopts and incorporates all preceding paragraphs for all purposes and pleads that Baylor Medical is liable for the acts or omissions and injuries caused by Duntsch pursuant to the joint venture they created with Duntsch.  Baylor Medical and Duntsch had a mutual right of control over an express or implied agreement for Duntsch to perform spinal surgeries at Baylor Medical's facilities in Plano with the common purpose of recruiting patients and performing spinal surgery in return for money for each participant in the venture. They had a community of pecuniary interest in the common purpose of putting in up-front cash to get the venture started, and they each had an equal voice in the direction of the enterprise and shared in expenses.  Baylor Medical and Duntsch are liable to Barry for all injuries caused by the surgery Duntsch performed, pursuant to their joint venture.

65.    Because Baylor Medical engaged in a joint venture with Duntsch, both jointly and severally liable to Barry for his injuries and damages.

66.    The employees of Baylor Medical, including Morgan, were acting not only in their individual capacities, but also as agents, representatives, and/or employees of Baylor Regional Medical Center at Plano and/or Baylor Health Care System.   Under the doctrines of agency and *respondeat superior*, Baylor Medical is liable for the acts and omissions of their employees and agents.

67.    Baylor Medical is also responsible for the negligence of Duntsch, as he was their actual or apparent agent and/or employee, and/or by virtue of the joint venture relationship they had established with Duntsch in which they funded his work and his office practice,

reached an agreement with him, which included actively marketing his services to referring physicians and the public, among other things.

### B.  Alter Ego/Joint Enterprise

68.     Baylor Health Care System d/b/a Baylor Regional Medical Center at Plano owned and operated Baylor Regional Medical Center at Plano and shared officers and directors. Baylor Health Care System had the right to direct and control Baylor Regional Medical Center at Plano and had an authoritative voice and right of control over an aspect of the enterprise that the other did not, and without each other, could not provide comprehensive healthcare services to Barry in the furtherance of the joint enterprise and common purpose of providing comprehensive patient care by and through its subsidiaries.

69.     Moreover, Baylor Health Care System, acting through its apparent, ostensible, actual, or by estoppel agents, officers, employees, subsidiaries and/or affiliated companies, organized and operated Baylor Regional Medical Center at Plano through the time of the rendition of medical services to Barry, that the ultimate parent corporation and/or Baylor Health Care System should be treated as one and the same legal entity with regard to any liability to Barry arising out of the claims made in this complaint due to the control asserted by Baylor Health Care System over the other and the inter-relationship of their business dealings, financial arrangements and the provision of the emergency room professional medical services, their corporate formalities should be disregarded, and each of them held vicariously liable for the conduct of the other.

## CAUSES OF ACTION

### A.  Negligence:  Baylor Medical

70.     Barry's damages and injuries, including his S1 nerve damage and arachnoiditis, were proximately caused by the negligent acts and omissions of Baylor Medical.   These negligent acts and omissions include, but are not limited to, the following:

a.     Failing to follow appropriate nursing practices and responsibilities, including being patient advocates directly to Barry as well as towards the institution;

b.     Failing to properly and timely use the chain of command to report the December 30, 2011 altercation between Duntsch and another Baylor Medical surgeon;

c.     Failing to inform Barry of the December 30, 2011 altercation between Duntsch and the other surgeon;

d.     Failing to timely interview the witnesses to said altercation in the operating room and respond to the information properly;

e.     Failing to follow proper credentialing standards prior to allowing Duntsch to perform surgery at Baylor Medical's facilities;

f.     Failing to prevent Duntsch from performing surgery on Barry on January 11, 2012;

g.     Failing to properly monitor and/or supervise Duntsch after they granted him privileges to perform spinal surgeries;

h.     Failing to notice Duntsch's pattern of intraoperative complications and poor surgical outcomes and to take action to prevent him from causing harm to patients;

i.     Failing to investigate Duntsch's odd behavior, lack of appropriate demeanor and extreme lack of organization;

j.     Failing to investigate Duntsch's multiple excuses for not undergoing requested drug testing; and

k.     Allowing Duntsch to operate on Baylor Medical patients after having received warnings about his lack of competence, questionable mental stability, alcoholism, and/or drug addiction.

### B.  Credentialing:  Baylor Medical

71.     Barry adopts and incorporates all preceding paragraphs and pleads that Baylor Medical should never have granted surgical privileges to Duntsch and/or should have required him to operate only with a proctor and/or should have revoked his privileges prior to him being allowed to operate on Barry.

### C.  Gross Negligence:  Baylor Medical

72.     Barry adopts and incorporates, by reference, all preceding paragraphs and further pleads that Baylor Medical's acts and omissions constitute gross negligence.   The acts or omissions, when viewed objectively from Baylor Medical's standpoint at the time they occurred, involved an extreme degree of risk considering the probability and magnitude of the potential harm to others, and Baylor Medical had actual, subjective awareness of the risk.

73.     The above acts and omissions involved an extreme degree of risk, and Baylor Medical had actual and subjective awareness of this extreme degree of risk.  These acts of gross negligence proximately caused Barry's injuries and damages.

74.     In addition to the foregoing, and pleading in the alternative, the conduct of Baylor Medical in allowing Duntsch to perform surgery on Barry was with malice, as that term was defined at common law; Baylor Medical acted with reckless disregard for the rights of others, thus injuring Barry. *See Shannon v. Jones*, 76 Tex. 141, 13 S.W. 477, 478 (1890) (defining malice as a reckless disregard for the rights of others).

75.     In addition, and pleading in the alternative, if Texas Civil Practice and Remedies Code § 41.001(7) is deemed to require proof that Baylor Medical had actual, subjective intent to harm Barry on the occasion in question before liability attaches, then the Legislature's act of deleting § 41.001(7)(B) of the definition of "malice" (that allowed proof of gross negligence) violates the "Open Courts" provision of the Texas Constitution by eliminating a common

law right arbitrarily in light of the purposes of the statute leaving only an impossible condition before liability will attach. *See* TEX. CONST. ART. I § 13. In the past, § 41.001(7) passed constitutional muster because section (B) was included. *See St. Luke's Episcopal Hosp. v. Agbor*, 952 S.W.2d 503, 506 (Tex. 1997) ("Considering the Legislature's pronouncement that "malice" need not be directed toward a specific individual in the context of exemplary damages, it does not follow that in the context of peer review, the committee must necessarily act with malice toward a specific patient for that patient to prove his or her case). With the elimination of section (B) in 2003, the statute now violates the Texas Constitution if it requires an actual subjective intent to harm or injure the specific patient involved before liability attaches.

76.    In addition to the foregoing, and pleading in the alternative, the conduct of Baylor Medical in allowing Duntsch to perform surgery on Barry was with malice, as that term is defined in Texas Civil Practice and Remedies Code § 41.001.

### D.  Negligence:  Duntsch & Baylor Medical

77.    Barry's damages and injuries, including his S1 nerve damage and arachnoiditis, were proximately caused by the negligent acts and omissions of Duntsch. Additionally, Baylor Medical is both directly and vicariously liable for Duntsch's negligent acts and omissions, which include, but are not limited to, the following:

a.    Failing to meet the applicable standard of care by misplacement of the hardware to the left of mid-line;

b.    Failing to meet the applicable standard of care by damaging the vertebral body, breaking off part of the bone, resulting in bone fragments that caused compression to the S1 nerve and became physically adherent to the S-1 nerve;

c.    Failing to meet the applicable standard of care by failing to recognize that the vertebral body had been damaged and remove the bone fragments timely;

    d.    Failing to meet the applicable standard of care by not properly assessing Barry's condition post-surgery and ordering appropriate imaging studies to diagnose the cause of his condition in a timely manner; and

    e.    Failing to meet the applicable standard of care by not addressing and/or repairing Barry's condition and complaints post-surgery.

### E.  Gross Negligence:  Duntsch & Baylor Medical

78.    Barry adopts and incorporates, by reference, all preceding paragraphs and further pleads that Duntsch's acts and omissions constitute gross negligence.  The acts or omissions, when viewed objectively from Duntsch's standpoint at the time they occurred, involved an extreme degree of risk considering the probability and magnitude of the potential harm to others, and Duntsch had actual, subjective awareness of the risk.

79.    The above acts and omissions involved an extreme degree of risk, and Duntsch had actual and subjective awareness of this extreme degree of risk.  These acts of gross negligence proximately caused Barry's injuries and damages.  Additionally, Baylor Medical is both directly and vicariously liable for Duntsch's grossly negligent acts and omissions.

### F.  Negligence:  Morgan & Baylor Medical

80.    Barry's damages and injuries, including his S1 nerve damage and arachnoiditis, were proximately caused by the negligent acts and omissions of Morgan.  Additionally, Baylor Medical is both directly and vicariously liable for Morgan's negligent acts and omissions, which include, but are not limited to:

    a.    The failure to inform Barry of the December 30, 2011 altercation between Duntsch and another surgeon;

    b.    The failure to inform Baylor Medical of the December 30, 2011 altercation between Duntsch and another Baylor Medical surgeon;

    c.    The failure to timely assess and evaluate Barry's complaints of pain, weakness, and paresthesia in his left leg after surgery in a timely fashion;

    d.   The failure to timely report Barry's complaints of pain, weakness, and paresthesia in his left leg after surgery to a medical doctor; and

    e.   The failure to timely report that Duntsch had not properly evaluated and responded to Barry's complaints of pain, weakness, and paresthesia in his left leg after surgery.

### G. Gross Negligence:  Morgan & Baylor Medical

81.    Barry adopts and incorporates, by reference, all preceding paragraphs and further pleads that Morgan's acts and omissions constitute gross negligence.   The acts or omissions, when viewed objectively from Morgan's standpoint at the time they occurred, involved an extreme degree of risk considering the probability and magnitude of the potential harm to others, and Morgan had actual, subjective awareness of the risk.

82.    The above acts and omissions involved an extreme degree of risk, and Morgan had actual and subjective awareness of this extreme degree of risk.   These acts of gross negligence proximately caused Barry's injuries and damages.   Additionally, Baylor Medical is both directly and vicariously liable for Morgan's grossly negligent acts and omissions.

## DAMAGES

83.    As a direct proximate result of the acts or omissions described above, singularly and collectively, Barry has been injured, sustained damages, and requests compensation in a sum far in excess of the minimum jurisdictional limits of this Court.   Each and all of the violations of the standard of care outlined herein were a proximate cause of damages, injuries and harm to Barry.

84.    Barry has suffered damages which include, but are not limited to, past and future medical and healthcare expenses, past and future physical pain, past and future mental anguish, past and future disfigurement, and past and future physical impairment, loss of earnings, and loss of earning capacity, for which he seeks monetary damages.

85.      In  addition,  Barry  seeks  exemplary  damages,  pre-judgment  interest,  post-judgment interest, costs of court, and such other and any other relief to which he may be entitled.

## JURY DEMAND

86.      Barry Morguloff demands a trial by jury.

## PRAYER

87.      Barry Morguloff respectfully prays  that  Baylor Health Care System d/b/a Baylor Regional Medical Center at Plano, Baylor Regional Medical Center at Plano, Kimberly Morgan and Christopher Duntsch are cited to appear and answer, and that upon jury trial, he recovers a  judgment  against them for all damages  sought, including all costs of court, prejudgment interest at the highest rate allowed by law, interest on the judgment at the highest legal rate from the date of judgment until collected, and any other relief, in law and in equity, to which he may be entitled.

Respectfully submitted,

DEANS  & LYONS, LLP


/s/ Michael P. Lyons
**Michael P. Lyons**
Texas Bar No. 24013074
**Robert J. Bogdanowicz III**
Texas Bar No. 24064916

325 N. Saint Paul St., Ste. 1500
Dallas, Texas 75201
(214) 736-7861 (t)
(214) 965-8505 (f)
mlyons@deanslyons.com
rob@deanslyons.com

**ATTORNEYS FOR PLAINTIFF**